**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA             :

    v.                                        :             **CRIMINAL NO. 11-581**

JOHN FRANCIS SHALKOWSKI             :

**GOVERNMENT'S SENTENCING MEMORANDUM**

        In the last five years, the defendant, John Francis Shalkowski, has been given three different chances by courts to refrain from criminal drug-related activity: in January 2008, he was given ARD for driving under the influence; in March 2009, his conviction for failing to give controlled dangerous substances (Xanax, Percocet and OxyContin) to police was conditionally discharged; and in August 2009, he was sentenced to costs and fines for possession of marijuana (the defendant was also in possession of cocaine; these fines remain outstanding). Despite these chances, and all the time working as a maintenance mechanic on the V-22 Osprey manufactured on The Boeing Company's Ridley Park campus, on two occasions the defendant attempted to buy an Actiq 1200 mcg lollipop, which is a very strong opioid pain medication, from an individual cooperating with the government.

        In his sentencing memorandum, the defendant attempts to deflect responsibility for his own criminal conduct by implying that he was induced by the government cooperator to buy the two Actiq lollipop on two separate dates.  This assertion is belied by a record in which the defendant did not, and could not from the facts of his two transactions, argue entrapment; by the drug that the defendant bought – Actiq is potentially lethal at any dose, but particularly at the highest doses, which is what the defendant attempted to buy, indicating that the defendant was

using opioids at the time of his attempted purchases; and by the defendant's positive drug tests which continued for several months after the defendant was arrested.

Simply put, the defendant has not fully accepted responsibility for his criminal conduct and, given his history of second chances, should be held accountable for that conduct by this Court.  Moreover, in the government's view, the defendant's abuse of his responsibilities as a Boeing worker contributed not only to the widespread acceptability of an illegal drug culture at Boeing, but significantly increased the likelihood of danger to the military end users of the aircraft manufactured at Boeing.  Accordingly, the government respectfully requests that the Court impose a sentence in the middle of the sentencing guideline range and impose a full term of supervised release thereafter.

## I.      BACKGROUND

On June 7, 2012, the defendant pled guilty to Counts One and Two of the information charging him with attempted possession of fentanyl, in violation of Title 21, United States Code, Section 846.  The charges stem from his attempts on September 22nd and 23rd, 2011, to illegally purchase fentanyl Actiq 1200mcg lollipops from an individual cooperating with the government inside of a building on The Boeing Company's Ridley Park campus.

## II.     SENTENCING CALCULATION

### A.      Statutory Maximum Sentence

According to the Probation Office, the Court may impose a sentence of two years imprisonment, a year of supervised release, a $200,000 fine, and a $50 special assessment.[1]

---

[1]      The potential fine of $100,000 per count of conviction is different from the fine that the parties understood could be imposed at the time of the defendant's change of plea hearing – it was the parties understanding that the maximum fine that could be imposed was $1,000 per count of conviction.  The special assessment is also different in that it is $25 instead of $100.

B.      **Sentencing Guidelines Calculation**

The Probation Office correctly calculated the defendant's advisory guideline range as follows:

> Base offense level based on attempted possession of controlled substances, 21 U.S.C. § 844, under U.S.S.G. § 2D2.1:                                                  **8**
>
> Adjustment for acceptance of responsibility, under U.S.S.G. § 3E1.1(a)[2]          **- 2**

---

**TOTAL OFFENSE LEVEL**                                                                                      **6**

The defendant has a Criminal History Category of **II** because he has two prior convictions for drug-related offenses.  PSR ¶¶ 30-37.  Accordingly, with a total offense level of 6 and a criminal history category of II, his guidelines range is **one to seven months imprisonment**.

**III.     DISCUSSION OF THE SENTENCING FACTORS**

Once the Court has properly calculated the guideline range, the Court must next consider all of the sentencing considerations in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence

---

[2]      As indicated above, the defendant attempts to deflect responsibility for his criminal actions in this case by blaming the government cooperator.  The government asks that this deflection be considered in determining the appropriate guideline sentence to be imposed.

disparities among defendants with similar records who have been found guilty of similar

conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. §

3553(a).[3]  In this case, the government believes that a sentence at the high end of the sentencing

guideline range is warranted.

A.      **Nature and Circumstances of the Offense and History and Characteristics of the Defendant.**

I.      **Fentanyl**

"Fentanyl is 100 times more potent than morphine as an analgesic," and is

extensively used for anesthesia and analgesia but is also used for chronic pain management.[4]

Actiq, the type of fentanyl product at issue here, is a "solid formulation of fentanyl citrate on a

stick that dissolves slowly in the mouth for transmucosal absorption.[5]  "It is intended for opiate-

tolerant individuals and is effective in treating breakthrough pain in cancer patients."[6]

"[Fentanyl] is similar to other opioids like morphine or oxycodone in its

pharmacological effects and produces analgesia, sedation, respiratory depression, nausea, and

---

[3] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the 'not greater than necessary' language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

[4] http://www.deadiversion.usdoj.gov/drugs_concern/fentanyl.pdf; http://www.justice.gov/dea/concern/fentanyl.html

[5] http://www.justice.gov/dea/concern/fentanyl.html

[6] Id.

vomiting.[7]  It also appears to produce muscle rigidity with greater frequency than other opioids.[8]
The biological effects are indistinguishable from those of heroin, with the exception that
fentanyls may be hundreds of times more potent."[9]

Like oxycodone, fentanyl is classified as a schedule II substance and is abused for
its intense euphoric effects.[10]  "Fentanyl can serve as a direct substitute for heroin in opioid
dependent individuals," but is a very dangerous substitute for heroin because it is much more
potent than heroin and results in frequent overdoses that can lead to respiratory depression and
death."[11]

**II.      Prescription Drug Abuse is a Rampant National and Local Problem**

Prescription drug abuse – despite (or maybe because of) popular misconceptions
– is more wide-spread, more destructive, and more dangerous than even street-level drug abuse.
Nearly seven million Americans are hooked on prescription drugs, more than are addicted to
cocaine, heroin, hallucinogens, ecstasy, and inhalants – combined.[12]  Prescription drugs hook the

---

[7] Id.

[8] Id.

[9] Id.

[10] http://www.justice.gov/dea/concern/fentanyl.html

[11] Id.

[12] Prescription Drug Abuse Ravages Youth, MSNBC, July 6, 2009, available at
http://www.nbcphiladelphia.com/news/health/Prescription_drug_abuse_ravages_state_s_youth.h
tml.

poor and the rich, the old and the young, the black and the white.[13]  It is an epidemic.[14]  Just like

street drugs, prescription drugs are dealt, hand-to-hand, just like baggies of heroin or vials of

crack.[15]  And just like street drugs, prescription drug abuse produces the same problems:

"addiction, crime and broken families."[16]

        In recent years, courts around the country have begun to recognize the same. See,

e.g., United States v. Marty, 450 F.3d 687, 690 n.4 (7th Cir. 2006) ("the danger that arises from

the sale, misuse, and abuse of OxyContin is not excused by its status as a prescription painkiller.

While Marty may have obtained her pills from a pharmacy, rather than a drug dealer, her crime

still poses a grave danger to the community."). In United States v. Purdue Frederick Co., Inc., a

court noted:

> Prescription drug abuse is rampant in all areas of our country . . . causing untold
> misery and harm. The White House drug policy office estimates that such abuse
> rose seventeen percent from 2001 to 2005. That office reports that currently there
> are more new abusers of prescription drugs than new users of any illicit drugs. As
> recently reported, "Young people mistakenly believe prescription drugs are safer
> than street drugs . . . but accidental prescription drug deaths are rising and
> students who abuse pills are more likely to drive fast, binge-drink and engage in
> other dangerous behaviors."

---

[13] See also Kimberly Kindy, A Tangled Story of Addiction, Washington Post, Sept. 12, 2008, at
A01, available at http://www.washingtonpost.com/wp-dyn/content/story/2008/09/11/
ST2008091103947.html (describing Cindy McCain's addiction to Percocet, and her doctor who
supplied her with the drugs lost his license).

[14] Prescription Drug Abuse Called "Epidemic", UPI, July 8, 2005, available at
http://www.upi.com/Science_News/2005/07/08/Prescription_drug_abuse_called_epidemic/UPI-
13411120831997/; National Drug Intelligence Center, National Drug Threat Assessment 2005,
U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

[15] Good Medicine Meets Bad Behavior, CNN, available at http://www.cnn.com/
2006/HEALTH/05/16/cnna.passierb/index.html.

[16] Michael Janofsky, Drug-Fighters Turn to Rising Tide of Prescription Abuse, N.Y. Times,
March 18, 2004, at A24.

495 F.Supp.2d 569, 576 (W.D. Va. 2007); see also McCaulley v. Purdue Pharma, L.P., 2002 WL

398715, at *1 (W.D. Va. 2002) (not precedential) (referring to the "national problem of

prescription drug abuse").

      In the Eastern District of Pennsylvania, prescription drug abuse is quite

significant as well.[17]  Local clinics have stated that "drug addiction in both Philadelphia and New

Jersey is almost legendary due to its severity.  Heroin and opioid-based prescription medication

are two the top drugs abused in these areas.  More than four percent of those surveyed in both the

Philadelphia area and in New Jersey reported using pain relievers for nonmedical purposes in the

past year . . . The rural areas of Pennsylvania, too, are increasingly becoming a target of drug

dealers."[18]  State legislators in Pennsylvania have been trying to address this growing problem.[19]

      Part of the reason that prescription drug abuse is so rampant is because they come

with the imprimatur of legitimacy: Doctors hand them out; it is not per se illegal to have them.

There is very low social disapproval.[20]  The general public – which the Court takes into

consideration at the time of sentencing when considering the nature of the defendant's conduct –

is grossly misinformed about the danger of prescription drug abuse.  According to a recent poll:

- 40 percent say prescription pills are "much safer" than illegal drugs.

---

[17] National Drug Intelligence Center, Philadelphia/Camden High Intensity Drug Trafficking Area
Drug Market Analysis, June 2007, available at
http://www.justice.gov/ndic/pubs23/23921/abuse.htm.

[18] See http://www.meditoxofpalmbeach.com/philadelphia-new-jersey-opiate-detox.html.

[19] Rafferty Bill Would Crack Down On Prescription Drug Abuse, Fraud, Senate Republican
Communications, May 3, 2004, available at http://www.pasenategop.com/news/
archived/2004/0504/rafferty-050304-prescrip.htm ("Rafferty noted that prescription drug fraud
and abuse are becoming a serious problem in Pennsylvania and other states, and stricter
guidelines need to be in place to combat the problem. He said prescription drug abuse accounts
for approximately one-third of all drug abuse in the United States.").

[20] See Jason Szep, Grappling With Prescription Drug Addiction, Reuters, July 30, 2008, available
at http://features.us.reuters.com/wellbeing/news/S3020463.html.

- 31 percent say there is "nothing wrong" with prescription drug use.

- 29 percent think prescription painkillers are non-addictive.[21]

In fact, prescription drugs contain opioids that are just as dangerous as those contained in cocaine and heroin.[22]  This low social disapproval is partly responsible for encouraging continued prescription drug abuse, especially among the young.[23]

In short, the prescription drug problem continues to grow because our society keeps underestimating its seriousness.[24]  It is a "significant threat" in the United States.[25] Combating prescription drugs drains law enforcement resources because "[d]rug diversion investigations can be complex and take many months."[26]  The investigation here took four years and a large amount of resources – the federal government simply does not have the resources to investigate every individual user at The Boeing Company's Ridley Park facility or to conduct similar investigations at every facility that manufactures sensitive equipment or vehicles.

---

[21] Good Medicine Meets Bad Behavior, CNN, available at http://www.cnn.com/ 2006/HEALTH/05/16/cnna.passierb/index.html.

[22] Will Dunham, Study Sees Prescription Drug Abuse at US Colleges, Reuters, Mar. 3, 2008, available at http://www.reuters.com/article/latestCrisis/idUSN03357573.

[23] White House Press Release, Jan. 24, 2008, available at http://www.whitehousedrugpolicy.gov/news/press08/012408.html; see also Prescription Abuse Outstrips Illegal Drug Use, UN Warns, The Guardian, Mar. 1, 2007, available at http://www.guardian.co.uk/society/2007/mar/01/ drugsandalcohol.drugs.

[24] See, e.g., Fredrick Kunkle, Attorney General Targets Prescription Drug Abuse, Washington Post, Oct. 6, 2005, at T03, available at http://www.washingtonpost.com/ wp-dyn/content/article/2005/10/05/AR2005100500007.html (state attorney general noting that "abuse of prescription drugs has gone unnoticed").

[25] National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

[26] Tim Reiterman, Prescriptions Supplanting Illegal Substances as Drugs of Choice, L.A. Times, May 18, 2008, available at http://www.latimes.com/news/ custom/scimedemail/la-me-drugs18-2008may18,0,6739996.story.

### III. Prescription Drug Abuse by Workers at The Boeing Campus's Ridley Park Facility Poses a Specific and Significant Threat to Society

The defendant in this and the 36 other cases arising out of the purchase and sale of prescription drugs at The Boeing Company's Ridley Park facility is a skilled worker whose employment at The Boeing Company provided him with the opportunity to be in the upper echelon of salary earners in the country: Internal Revenue Service's 2010 database indicates that the top 10% of Americans earn $113,799 per year; the top 25% earn $67,280 per year; and the top 50% earn $33,048.[27]  Here, the defendants salary at the time of his arrest was nearly $80,000 including overtime pay.  And unlike junkies and drug dealers on the street, the defendant had options.  The Boeing Company's medical coverage includes drug treatment and counseling, and the company's Employee Assistance program offered them confidential access to drug counselors and inpatient and outpatient drug treatment.

Furthermore, the defendant worked as a maintenance mechanic on The Boeing Company's production of the V-22 Osprey.  The V-22 Osprey is the first aircraft designed from the ground up to meet the needs of the Defense Department's four U.S. armed services: it "can transport 24 combat troops, 20,000 pounds of internal or up to 15,000 pounds of external cargo using its medium lift and vertical takeoff and landing capabilities; meets U.S. Navy requirements for combat search and rescue, fleet logistics support, and special warfare support; matches the U.S. Special Operations Command's requirement for a high-speed, long-range, vertical lift aircraft; can be stored aboard an aircraft carrier or assault ship because the rotors can fold and the wings rotate; [and] has air-to-air refueling capability, the cornerstone of the ability to self-deploy."[28]  As a result, "more than 165 Osprey tiltrotors are currently in operation across 10

---

[27] http://www.financialsamurai.com/2011/04/12/how-much-money-do-the-top-income-earners-make-percent/

[28] http://www.boeing.com/rotorcraft/military/v22/

Marine Corps and two Air Force Special Operations Command Osprey squadrons.  The two services have together logged 16 successful combat, humanitarian, ship-based or Special Operations deployments since 2007.  The worldwide Osprey fleet has amassed more than 135,000 flight hours, with nearly half of those hours logged in the past two years."[29]

The consequences of any undetected errors made in by the defendant during the course of his employment cannot be understated.  Aside from the fact that the defendant was involved in the maintenance of large, heavy machinery, any errors that affected the performance of completed V-22 Osprey could prove disastrous: possible injury or death to the crew using the particular aircraft plus complete grounding of the entire fleet.  In fact, the United States military has also grounded its V-22 Osprey fleet when accidents have happened.   For example, the United States Marine Corps grounded its fleet of V-22 Osprey in February 2007 after discovering a glitch in a computer chip that could cause the aircraft to lose control; and grounded its fleet of V-22 Osprey in 2000 after two fatal crashes that killed 23 Marines.[30]

## IV.    Analysis of the Defendant's Background

The defendant began his employment at Boeing in 1986 and worked as a maintenance mechanic.  He signed Boeing's Code of Conduct prohibiting him from violating all applicable laws, rules and regulations for the length of his tenure with the company.  During his tenure at Boeing, he was given three different chances by state courts to refrain from criminal drug-related activity, despite the fact that he continued to commit crimes during those chances. The chronology of events is as follows: On July 21, 2007, the defendant was arrested for driving under the influence, arising out of the defendant crashing his car while drunk.  Approximately a month later, on August 30, 2007, the defendant was arrested for failing to give controlled

---

[29] http://www.boeing.com/rotorcraft/military/v22/docs/V-22_overview.pdf

[30] http://www.washingtonpost.com/wp-dyn/content/article/2007/02/09/AR2007020901860.html

dangerous substances (Xanax, Percocet and OxyContin) to police, again arising out of a traffic

stop during which the defendant appeared to be driving under the influence.  In January 2008,

the defendant was given ARD for the July 21st DUI case, and in February 2008, he was given the

opportunity for a one-year conditional discharge on the failure to give controlled dangerous

substances to police.  It appears that a few days before that one-year conditional discharge was

completed, the defendant was arrested for possession of marijuana (the defendant was also in

possession of cocaine).  Nonetheless, the conditional discharge was granted in March 2009, and

the defendant was sentenced to fines and costs on the possession of marijuana charge (these fines

remain outstanding).

        In addition to criminal conduct, the defendant's Boeing disciplinary files show

numerous violations of the Boeing Code of Conduct: (1) On August 1, 2011, the defendant

received a written warning for poor attendance; (2) on March 7, 2011, the defendant received a

written warning for violating company policy and expected behavior; (3) on June 23, 2009, the

defendant received a written warning for misuse of company time; (4) on May 28, 2009, October

16, 2009, and December 10, 2009, the defendant received written warnings for poor attendance;

and (5) on March 25, 2008, the defendant received a written warning for using company

property without authorization to perform a non-work related task.  Despite his important role in

the manufacture of the V-22 Osprey and his history of criminal convictions and work-related

disciplinary issues, in September 2011, the defendant sought to purchase the extremely strong

opioid fentanyl on two occasions while in a building on the Boeing campus.  Certainly, the

nature and circumstances of the offenses committed and the history and characteristics of the

defendant counsel in favor of a guideline sentence.

**B.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

The sentence imposed in this case must fairly punish the defendant for his criminal conduct, and reflect the seriousness of the offense.  Of the Boeing defendants charged with misdemeanors, this defendant is one of the few that has previously been given chances by courts to refrain from continued criminal conduct.  Given his prior experience with diversionary programs, the defendant should have been personally aware of the benefits of the free, confidential, drug counseling and treatment services available to him at Boeing.  Despite this, he chose to purchase serious and potentially deadly opioids while at work.

The government respectfully submits that to sentence this defendant to probation or even to the low end of the advisory guideline range would not reflect the seriousness of his offenses, would undercut respect for the law by those with whom he worked, and would not provide a just punishment for his offenses.

**C.      The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant**

When passing the Sentencing Reform Act, Congress explained:

[It is our] view that in the past there have been many cases, particularly in instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures . . . and because society required no insulation from the offender, without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance. The placing on probation of [a criminal] may be perfectly appropriate in cases in which, under all the circumstances, only the rehabilitative needs of the offender are pertinent; such a sentence may be grossly inappropriate, however, in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.

S. Rep. No. 98-225, at 91-92 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3274-75.

Prescription drug abuse is a "significant threat" in the United States.[31]  The investigation here took a large amount of government resources and, because of the nature of the plant under investigation and the closed culture of its employees, took many years.  Accordingly, a sentence within the guidelines is necessary to afford both specific and general deterrence to criminal conduct.   The recommended sentence of incarceration affords adequate deterrence to others who would commit a similar offense, and protects the public from further crimes of the defendant, for at least as long as he remains incarcerated.  The general deterrent effect of a prison sentence is an appropriate consideration in choosing a reasonable sentence.  As the courts of appeals have held both before and after Booker, deterrence under Section 3553(a) is not limited to deterrence of the particular defendant. See, e.g., United States v. Eura, 440 F.3d 625, 638 (4th Cir. 2006) (concurring opinion) (referring to the court's consideration of "the general deterrence factor, § 3553(a)(2)(B)"); United States v. Jordan, 435 F.3d 693, 698 (7th Cir. 2006) (describing how Section 3553(a) "specifies that the court may consider the need for general deterrence and respect for the law"); United States v. Glover, 431 F.3d 744, 751 (11th Cir. 2005) (noting that pre-Booker and post-Booker, "the underlying goals of the statute and the Guidelines are retribution, general deterrence, incapacitation, and rehabilitation" (internal quotation marks omitted)); see also United States v. Yeaman, 248 F.3d 223, 232 (3d Cir. 2001) (referring to Section 3553(a)'s goals of "general deterrence, specific deterrence, retribution, and rehabilitation").  A sentence in the middle of the sentencing guidelines would help accomplish this goal.

---

[31]     National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

    **D.**     **The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

There is no need in this case to adjust the sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . ." Section 3553(a)(2)(D).

    **E.**     **The Guidelines and Policy Statements Issued by the Sentencing Commission**

As stated earlier, the Guidelines retain their significant importance in advising judges about appropriate sentences.  Uniformity in sentencing should be a paramount goal; in order to rid the criminal justice system of unpredictability and possible bias, like offenders should receive like sentences, to the extent possible.  The only vehicle for achieving such a goal is through the application of the Sentencing Guidelines.  Here, the defendant abused his position as a worker on the V-22 Osprey and put the lives of the men and women serving the United States and other militaries around the world at risk.  His conduct warrants a guideline sentence and, the government submits, a sentence in the middle of the guidelines.

    **F.**     **The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

A guidelines sentence is necessary when considering the importance of avoiding unwarranted sentencing disparities, another factor that is set forth in Section 3553(a). As an initial matter, this Section 3553(a) factor is not primarily concerned with sentencing disparities in a particular case; it is designed to ensure sentencing consistency among similarly situated defendants across the entire nation. See United States v. Parker, 462 F.3d 273 (3d Cir. 2006); United States v. Carson, 560 F.3d 566, 586 (6th Cir. 2009) ("Although it is true that § 3553(a)(6) requires a sentencing judge to consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,'" that

14

"factor 'concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct – not disparities between co-defendants.'").

      **G.**      **<u>The Need to Provide Restitution to Any Victims of the Offense</u>**

      Restitution is not an issue in this case.

**IV.**      **CONCLUSION**

      For all of the reasons stated above, the government respectfully recommends a sentence in the middle of the sentencing guidelines range of one to seven months imprisonment. This sentence is necessary to address the serious nature of the offense and the defendant's undeterred criminal conduct.

      Respectfully submitted,

      ZANE DAVID MEMEGER
      United States Attorney

      _____/s/_____
      FAITHE MOORE TAYLOR
      ASHLEY K. LUNKENHEIMER
      Assistant United States Attorneys

<u>**CERTIFICATE OF SERVICE**</u>

I certify that a copy of the GOVERNMENT'S SENTENCING MEMORANDUM has been filed electronically on the Electronic Case Filing system and is available for viewing and downloading from the ECF system, and/or was served by electronic mail on the following defense counsel:

William J. Murray, Esq.
Counsel for John Francis Shalkowski

_____/s/_____
Ashley K. Lunkenheimer
Assistant U.S. Attorney

Date:  September 21, 2012

16